**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ANTOINETTE HOOK,

    Plaintiff,        Case No. 06-12893

v.              Hon. Gerald E. Rosen

JASON HAMILTON RUBIN
and JANE HAMILTON RUBIN,

    Defendants.
_____/

**OPINION AND ORDER REGARDING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _September 25, 2008_

   PRESENT: Honorable Gerald E. Rosen
         United States District Judge

## I. INTRODUCTION

In this case, Plaintiff Antoinette Hook seeks to recover for injuries she sustained

when a car operated by Defendant Jason Rubin and owned by Defendant Jane Rubin

struck the back of Plaintiff's vehicle while it was stopped at a traffic light. This Court's

jurisdiction rests upon diversity of citizenship, with Plaintiff being a Michigan resident

and Defendants being residents of Illinois. See 28 U.S.C. § 1332(a).

Through a motion now pending before the Court, Defendants seek summary

judgment in their favor on Plaintiff's state-law claim of negligence. In support of this

motion, Defendants argue that Plaintiff has failed to establish that she suffered a "serious impairment of body function," as necessary to sustain Plaintiff's claim under Michigan's no-fault statutory scheme governing tort liability for motor vehicle accidents. <u>See</u> Mich. Comp. Laws § 500.3135(1). In response, Plaintiff contends that she has raised genuine issues of material fact as to this statutory requirement through her medical records, the opinions of her doctors, and other materials.

Having reviewed the parties' written submissions and accompanying exhibits in support of and opposition to Defendants' motion, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." <u>See</u> Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. <u>FACTUAL BACKGROUND</u>

At around 8:00 p.m. on Friday, February 13, 2004, Plaintiff Antoinette Hook was driving her Ford Taurus automobile when she came to a stop at a traffic light on northbound Harper Avenue in St. Clair Shores, Michigan. While Plaintiff was stopped at the light, her vehicle was struck from behind by a Ford automobile operated by Defendant Jason Rubin and owned by his mother, Defendant Jane Rubin.

According to the police report of the incident, Jason Rubin told the responding police officer that he was bending down to pick up a cell phone when his car struck

Plaintiff's automobile. Mr. Rubin was arrested for driving with a suspended license and was issued a citation for this infraction, as well as for lacking proof of insurance and for being unable to stop his vehicle within an appropriate distance. Plaintiff was able to drive her vehicle home, and she returned to work the following Monday, February 16, 2004, in her position as director for Liberties, Inc., a non-profit agency.

On February 18, 2004, five days after the accident, Plaintiff visited her podiatrist, Dr. Laurie B. Glanz, complaining of pain in her left foot. (See Plaintiff's Response, Ex. 3, Glanz Aff. at ¶¶ 4-5.)[1] Prior to the automobile accident, Dr. Glanz had been treating Plaintiff since June of 1999 for left foot and ankle pain, including a left ankle fracture sustained in March of 2002. According to Dr. Glanz's affidavit, the initial post-accident examination of Plaintiff's left foot revealed "severe pain upon direct palpation of the sub-talar joint (sinus tarsi)." (Glanz Aff. at ¶ 5.) Dr. Glanz further observed that "[t]he joint was inflamed, and there was residual swelling involving the foot and ankle." (Id.)

Through this and subsequent examinations and treatment, Dr. Glanz has arrived at the opinion that Plaintiff's "prior podiatric problems have become more severe after the injuries she had sustained from the car accident." (Id. at ¶ 6.) Dr. Glanz further states that she treated Plaintiff for these "car accident podiatric injuries" through "injection infiltration of Dexamethasone, and/or Celestone Soluspan (cortisones) mixed with 2%

---

[1]Dr. Glanz's reference in her affidavit to Plaintiff's February 18, 2004 office visit contradicts Plaintiff's own deposition testimony regarding her medical treatment following the accident. As Defendants observe in their motion, Plaintiff testified at her deposition that she did not seek medical treatment for any injuries arising from the accident until May of 2004, or roughly three months after the accident. (See Defendants' Motion, Ex. B, Plaintiff's Dep. at 29.)

Xylocaine plain, nerve block, and whirlpool therapy," and that, when these measures failed to alleviate Plaintiff's symptoms, an ambulatory cast was prescribed on several occasions to immobilize Plaintiff's left foot and ankle.  (Id. at ¶¶ 6, 9.)  Dr. Glanz also ordered an MRI of Plaintiff's left knee and ankle in July of 2004, which revealed, in the doctor's opinion, a likely "tear or strain of the anterior talofibular ligament of the left foot."  (Id. at ¶¶ 7-8.)

Overall, Dr. Glanz summarizes her treatment of Plaintiff in the two-year period between the accident and March of 2006 as encompassing "injection therapy, alternated with nerve blocks and physical therapy treatments in the ankle joint."  (Id. at ¶ 10.)  Dr. Glanz opines that this "intensive therapy" was "necessary because of the new and chronic complaints and symptoms suffered by [Plaintiff] as a result of the automobile accident of February 13, 2004."  (Id. at ¶ 11.)  Although Dr. Glanz states that this "treatment regimen has been successful in managing [Plaintiff's] severe pain and limited motion in her left ankle joint," she reports that, as a result of these accident, she has reclassified Plaintiff's diagnosis from "acute in nature" to "chronic ankle joint pain that will persist indefinitely."  (Id. at ¶ 12.)

In addition to this treatment with Dr. Glanz, Plaintiff also sought treatment on April 27, 2004 from Dr. Eric N. Backos, a specialist in physical medicine and rehabilitation.[2]  In this visit, Plaintiff complained of neck and back pain caused by the

---

[2]As with Dr. Glanz, Plaintiff had been examined and treated by Dr. Backos prior to the accident.  Dr. Backos summarizes this history in a September 6, 2005 narrative report, stating

accident, and Dr. Backos determined upon examining her that she was suffering from left cervical radiculopathy and left lumbar radiculopathy.  (See Plaintiff's Response, Ex. 4, Backos Aff. at ¶¶ 4-5.)  Based on these "cervical and lumbar injuries," Dr. Backos restricted Plaintiff from returning to work, prescribed daily household assistance, and prescribed Darvocet for pain and Soma as a muscle relaxant.  (Id. at ¶¶ 6-7.)  He also ordered an MRI and EMG "to rule out disc herniation and lumbar and cervical radiculopathy."  (Id. at ¶ 7.)  Finally, he prescribed six weeks of physical therapy, but this was discontinued after about three or four weeks as painful and not beneficial.  (See Plaintiff's Response, Ex. 4, 9/6/2005 Report at 4.)

Dr. Backos next examined Plaintiff on September 2, 2004, by which time she had received the results of the MRI and EMG ordered by Dr. Backos and had been referred to a neurosurgeon, Dr. Goldberger.  Based on his examination of Plaintiff and his review of the test results, Dr. Backos diagnosed Plaintiff as suffering from "[c]ervical radiculopathy with cord compression" and "[l]eft lumbar spasm with disc bulging."  (Plaintiff's Response, Ex. 4, 9/2/2004 Report at 1.)  Dr. Backos opined that Plaintiff remained unable to return to work, that she could not perform household chores or any significant lifting, pushing, or pulling, and that her "[p]rognosis for full recovery is poor."  (Id. at 1-2.)  He recommended that Plaintiff "continue to take Darvocet for pain and Soma as a muscle relaxant," and that she "continue her follow-up with Dr. Goldberger."  (Id. at 1.)

that Plaintiff's first visit dated back to March of 1998, if not earlier, and that her last visit prior to the accident was in June of 2001.  (See Plaintiff's Response, Ex. 4, 9/6/2005 Report at 1-2.)

Plaintiff continued her treatment with Dr. Backos until August 4, 2005, and underwent a second MRI scan in May of 2005.  In his September 6, 2005 narrative summary of his treatment of Plaintiff, Dr. Backos reported that Plaintiff still experienced "a lot of pain" and restricted motion in her neck as of her last visit, and that she used a cane for ambulation.  (Plaintiff's Response, Ex. 4, 9/6/2005 Report at 4.)  He continued to opine that Plaintiff's "[p]rognosis for full recovery is poor," in light of "the significant period of time that has transpired without significant improvements."  (Id.)  Finally, in an October 4, 2005 addendum to his earlier narrative summary, Dr. Backos stated that he had once again reviewed the MRI scans taken of Plaintiff's cervical spine in May of 2004 and May of 2005, and that, in his opinion, these scans revealed a herniated disc "centrally in the C4-5 area" that "would be considered of significant nature and would be expected to produce pain and spasm which the patient does complain of."  (Plaintiff's Response, Ex. 4, 10/4/2005 Report.)  Dr. Backos noted that "[s]urgical intervention may be of benefit for this condition," but that Plaintiff "does not want to pursue surgery."  (Id.)

In accordance with Dr. Backos's recommendation following his initial post-accident examination of Plaintiff on April 27, 2004, Plaintiff discontinued working at Liberties, Inc. on May 18, 2004.  Plaintiff testified at her deposition that she informed her supervisor at that time that "I just can't work anymore because of my auto injury," and she cited back, neck, and leg pain as well as her inability to "pick up a piece of paper off the floor."  (Plaintiff's Dep. at 32.)  Plaintiff remained off work until November of 2005, with this time away from her job supported by (i) attending physician reports submitted

6

by Dr. Glanz and Dr. Backos to Plaintiff's auto insurer, Geico Insurance, in support of a claim of continued disability from employment, (see Plaintiff's Response, Exs. 5, 6),[3] and (ii) notes from these doctors stating that Plaintiff remained unable to work through at least January of 2005, (see Plaintiff's Response, Exs. 7, 10).

In addition, beginning in May of 2004 and continuing for about a year, Plaintiff received assistance with her household chores from her son, Jeff, with Geico paying the cost of this assistance. (See Plaintiff's Dep. at 41-42.) Plaintiff further testified that she is able to do only limited shopping following the accident, that she cannot go to dances, that she has shortened her visits to church, and that, in general, she has learned to limit her activities. (Id. at 38-42.)

While Plaintiff was off work, Geico sent her for a January 13, 2005 independent medical examination by Dr. Joseph P. Femminineo, who reported that he found "[n]othing on clinical examination or on imaging studies to suggest any ongoing pathology related to the motor vehicle accident." (Defendants' Motion, Ex. G, 1/13/2005 IME Report at 5.) Instead, Dr. Femminineo opined that the accident "may have temporarily made [Plaintiff's] arthritic condition more symptomatic." (Id.) The doctor reported that he saw "nothing here on clinical examination or review of records that would require any type of home assistance whatsoever," and that "I see no need for any

_____

[3]According to Plaintiff's response to Defendants' motion, Geico paid her medical bills and wage loss for about a year after the accident, and her entitlement to further benefits was addressed and resolved in state court litigation. (See Plaintiff's Response Br. at 5.)

restrictions."  (Id.)

## III. ANALYSIS

**A.  The Standards Governing Defendants' Motion**

Through the present motion, Defendants seek summary judgment in their favor on Plaintiff's state-law claim of negligence.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

As discussed below, the issue upon which Defendants' motion turns — namely, whether Plaintiff has suffered a "serious impairment of body function" within the meaning of the governing Michigan statute — is amenable to resolution as a matter of law, so long as the record is viewed in a light most favorable to Plaintiff.  Accordingly, the Court turns to the controlling question of law presented in Defendants' motion.

**B.  Issues of Fact Remain as to Whether Plaintiff Has Suffered a "Serious Impairment of Body Function" as Defined Under Michigan No-Fault Law.**

In support of their request for summary judgment, Defendants argue that Plaintiff has failed to meet one of the prerequisites to a tort recovery under Michigan's no-fault statutory scheme governing motor vehicle accidents.  In particular, Michigan law imposes "tort liability for noneconomic loss caused by [the] ownership, maintenance, or use of a motor vehicle" only in those cases in which "the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement."  Mich. Comp.

Laws § 500.3135(1). The parties agree that the second category, "serious impairment of body function," governs Plaintiff's claim in this case, but they disagree as to whether Plaintiff sustained such injuries when her car was struck from behind by Defendants' vehicle. As discussed below, the Court cannot say as a matter of law that Plaintiff's injuries fall below this threshold for a noneconomic recovery under Michigan law.

As recently explained by the Michigan Supreme Court, Michigan's no-fault statute "abolished tort liability generally in motor vehicle accident cases and replaced it with a regime that established that a person injured in such an accident is entitled to certain economic compensation from his own insurance company regardless of fault." Kreiner v. Fischer, 471 Mich. 109, 683 N.W.2d 611, 616 (2004). "In exchange for the payment of these no-fault economic loss benefits from one's own insurance company," the Michigan legislature "significantly limited the injured person's ability to sue a third party for noneconomic damages, e.g., pain and suffering." Kreiner, 683 N.W.2d at 616. In particular, no such tort recovery may be obtained "unless the injured person 'has suffered death, serious impairment of body function, or permanent serious disfigurement.'" 683 N.W.2d at 616 (quoting Mich. Comp. Laws § 500.3135(1)) (footnote omitted).

Under this statutory scheme, a "serious impairment of body function" is defined as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(7). The statute further provides that the "issue[] of whether an injured person has suffered serious impairment of body function" is a "question[] of law for the court," so long as

"[t]here is no factual dispute concerning the nature and extent of the person's injuries" or any such factual dispute "is not material to the determination as to whether the person has suffered a serious impairment of body function." Mich. Comp. Laws § 500.3135(2)(a).

The Supreme Court's decision in <u>Kreiner</u>, combined with several subsequent Michigan appellate and federal district court rulings, provides considerable guidance in determining whether Plaintiff's injuries in this case constitute a "serious impairment of body function" under Michigan's no-fault statute. Upon reviewing the statutory definition of a "serious impairment of body function," the Court in <u>Kreiner</u> explained:

> The starting point in analyzing whether an impairment affects a person's "general" i.e., overall, ability to lead his normal life should be identifying how his life has been affected, by how much, and for how long. Specific activities should be examined with an understanding that not all activities have the same significance in a person's overall life. Also, minor changes in how a person performs a specific activity may not change the fact that the person may still "generally" be able to perform that activity.

> * * * *

> The following nonexhaustive list of objective factors may be of assistance in evaluating whether the plaintiff's "general ability" to conduct the course of his normal life has been affected: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. This list of factors is not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves. For example, that the duration of the impairment is short does not necessarily preclude a finding of a "serious impairment of body function." On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a "serious impairment of body function." Instead, in order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the

course of his or her normal life."

Kreiner, 683 N.W.2d at 625-26 (footnotes omitted).

The Court then applied this analysis to the facts of the two cases before it. In the first, plaintiff Daniel Straub had injured three fingers on his nondominant hand when his motorcycle collided with an automobile, suffering a broken bone in his little finger and injured tendons in two other fingers. He underwent outpatient surgery four days after the accident to repair the tendons and wore a cast for about a month to assist the healing process, but he received no medical treatment for the broken bone. Straub took prescription pain medication for about two weeks following the accident, and attended two sessions of physical therapy. Straub's doctor authorized him to return to work on a part-time basis six weeks after the accident, and he did so two weeks later. He returned to full-time work roughly three months after the accident, and resumed his weekend work of performing in a band about a month later. Straub testified at his deposition that he had regained his ability to perform all of the job duties and activities in which he had engaged prior to his injury, albeit sometimes with discomfort, but that he remained unable to completely straighten his middle finger and to completely close his hand.

Under these facts, the Court found that Straub had not suffered a serious impairment of body function:

> [Straub's] treatment was not significant or long-term. Within two months, the fracture and surgical wounds had healed. There were two sessions of physical therapy. At that point, Straub discontinued all medical treatment. Plaintiff estimated he was ninety-nine percent back to normal by mid-January 2000. Given that Straub's injury was not extensive, recuperation

11

was short, unremarkable, and virtually complete, and the effect of the injury on body function was not pervasive, we conclude that Straub's general ability to live his normal life was not affected. There is no medical evidence that Straub has any residual impairment or that the course of Straub's life has been affected. The temporary limitations Straub experienced do not satisfy the statutory prerequisites. Considered against the backdrop of his preimpairment life and the limited nature and extent of his injuries, we conclude that Straub's postimpairment life is not so different that his "general ability" to lead his normal life has been affected. Because the course of Straub's normal life has not been affected, he failed to satisfy the "serious impairment of body function" threshold for recovery of noneconomic damages.

Kreiner, 683 N.W.2d at 627.

In the second case before the Court, plaintiff Richard Kreiner was injured in an automobile accident, and then visited his family physician four days later with complaints of pain in his lower back, hip, and leg. The doctor administered a cortisone injection, and then gave a second injection and prescribed physical therapy and pain medication when Kreiner returned a few days later and complained that the pain was persisting. Six weeks later, when Kreiner continued to complain of pain, he was referred to a neurologist who diagnosed him as suffering mild nerve irritation to the right fourth lumbar nerve root in his back and degenerative disc disease with spondylolisthesis. The neurologist prescribed Motrin along with a muscle relaxant, and instructed Kreiner to perform exercises at home. Kreiner made four follow-up visits to the neurologist over the next year and a half, with Kreiner continuing to complain of radiating pain and the doctor prescribing pain medication, a continued program of home exercise, and a three-week course of physical therapy. Throughout this period, Kreiner continued to work as a self-employed carpenter

and construction worker, although he limited himself to a six-hour workday, was unable to do roofing work or to stand on a ladder for a prolonged period, could not lift over eighty pounds, and could no longer walk more than a half-mile without resting.

Again, the Court found that Kreiner had not demonstrated a serious impairment of body function. The Court observed that Kreiner's "life after the accident was not significantly different than it was before the accident," as he continued to perform most of the same job tasks and "[h]is injuries did not cause him to miss one day of work." 683 N.W.2d at 628. The Court then reasoned:

> Looking at Kreiner's life as a whole, before and after the accident, and the nature and extent of his injuries, we conclude that his impairment did not affect his overall ability to conduct the course of his normal life. While he cannot work to full capacity, he is generally able to lead his normal life. A negative effect on a particular aspect of an injured person's life is not sufficient in itself to meet the tort threshold, as long as the injured person is still generally able to lead his normal life. Considered against the backdrop of his preimpairment life, Kreiner's postimpairment life is not so different that his "general ability" to conduct the course of his normal life has been affected.

Kreiner, 683 N.W.2d at 628 (footnotes omitted).

In contrast to these rulings in Kreiner, two subsequent Michigan Court of Appeals decisions illustrate the sorts of circumstances under which a plaintiff can successfully demonstrate a serious impairment of body function. First, in McDanield v. Hemker, 268 Mich. App. 269, 707 N.W.2d 211 (2005), plaintiff Mable McDanield suffered head, neck, back, and shoulder injuries when a pickup truck failed to stop at an intersection and collided with her van. McDanield's doctor ordered her to remain off work as a school

bus driver and food service worker for six weeks, and her doctor again restricted her from working for several months when she began to experience increased neck and arm pain approximately three months after the accident. Repeated medical examinations and treatments over the next two years or more revealed that McDanield had suffered permanent and progressive damage to ligaments in her neck and injuries to her cervical spine, and one of her doctors opined that she would experience "a life of pain and discomfort and will need to adapt accordingly." McDanield, 707 N.W.2d at 219.

Under this record, the Court of Appeals found that McDanield had suffered a serious impairment of body function, where "[c]omparing McDanield's life before and after the accident is similar to comparing day to night; all aspects of her life have been significantly affected with no meaningful relief in sight." 707 N.W.2d at 219. Applying the five factors enumerated in Kreiner, the court found that each of these considerations favored a finding of an effect upon McDanield's general ability to lead her normal life, where (i) the pain and restrictions experienced by McDanield "come into play in almost any activity or movement," (ii) her medical treatment was "extensive," "ongoing and will continue into the foreseeable future," (iii) her impairment was "in all likelihood . . . permanent," with a "poor" prognosis for any eventual improvement, and (iv) her doctor had imposed restrictions and prescribed treatments that corroborated the residual pain she was suffering as a result of her injuries. 707 N.W.2d at 219-21.

The Court of Appeals also determined in Williams v. Medukas, 266 Mich. App. 505, 702 N.W.2d 667 (2005), that the plaintiff in that case, Edwin Williams, had suffered

14

a serious impairment of body function. Williams sustained a fractured right shoulder and left hand in an automobile accident, and the ensuing treatment left both of his arms immobilized for a month following the accident. About three months after the accident, Williams returned without restrictions to his work as a salesman, and resumed coaching a middle school basketball team. In holding that Williams's injuries had affected his general ability to lead his normal life, the court reasoned:

> Here, Williams' injuries were objectively manifested by x-rays. His arms were rendered virtually useless for one month following his accident, and he was unable to feed himself or otherwise attend to his basic needs. Some three months after the accident, Williams returned to work and to his position as a coach for a middle school girls basketball team. Although Williams was able to return to these positions, he could no longer engage in activities that required him to lift his right arm above his head. Because of this, he could not demonstrate to his students how to shoot [a] basketball. In addition, Williams testified at his deposition that before the accident he had played golf two or three times a week. After the accident, Williams could no longer play golf or engage in activities with his grandchildren, such as playing catch. Although no evidence showed that Williams' physician restricted him from engaging in various recreational activities, and although self-imposed restrictions will not establish a residual impairment, Williams' physician did indicate that Williams lacked full range of motion in his left wrist and that his right shoulder was healing in such a way that its range of motion would be permanently limited. While these limitations might not rise to the level of a serious impairment of body function for some people, in a person who regularly participates in sporting activities that require a full range of motion, these impairments may rise to the level of a serious impairment of a body function. Given Williams' participation in teaching basketball and his love of golf, which he can no longer pursue, we must conclude that the limitations imposed by Williams' injuries affect his general ability to lead his normal life.

Williams, 702 N.W.2d at 670-71 (citations omitted).

This Court also views the federal district court decision in McMullen v. Duddles,

405 F. Supp.2d 826 (W.D. Mich. 2005), as instructive here. In that case, a car driven by plaintiff Lisa McMullen was rear-ended by a pickup truck at an intersection, and McMullen was taken to a hospital and diagnosed with a herniated disc. She pursued a variety of forms of treatment over the following years, including physical therapy, injections, pain medication, and muscle relaxants, but she continued to experience significant pain and was considered a candidate for disc replacement or spinal fusion surgery. Throughout all this time, however, "[n]o physician ha[d] placed any restrictions or limitations upon McMullen's employment or other activities," albeit in part because McMullen "work[ed] for her parents and they ma[d]e any necessary accommodations." McMullen, 405 F. Supp.2d at 829.

The court found that the case before it was similar to McDanield, supra, and thus warranted the same outcome. First, the court noted the evidence that McMullen had difficulty finding and keeping a job that she was capable of performing, and that she had been successful in working for her parents only because they were able to accommodate her occasional need for a significantly reduced work schedule. In addition, the record revealed that as a result of McMullen's injury, she was "unable to engage in many of the recreational activities that she formerly enjoyed," she "walk[ed] differently because she is stiff," and she could not "stand for more than ten or fifteen minutes at a time." McMullen, 405 F. Supp.2d at 838. The court further observed that McMullen had "received various forms of treatment that have provided little or no relief," that she was "still being treated for pain by doctors on a regular basis," and that "except for the

16

possibility of major back surgery, there is no relief in sight and the duration of the impairment has been and will be long term." 405 F. Supp.2d at 838. Finally, the court rejected the defendant's assertion that McMullen's limitations were all self-imposed, where her doctors continued to prescribe pain medication and physical therapy, and where these physicians had recognized that she might not be able to tolerate certain activities and had advised her to avoid such activities.

Against this backdrop, the Court returns to the present case. As the statutory definition of a "serious impairment of body function" demonstrates, and as the parties acknowledge, there are two components to the showing that Plaintiff must make to secure a noneconomic recovery under Michigan's no-fault statute: (i) her injuries must have produced an "objectively manifested impairment of an important body function," and (ii) this impairment must have "affect[ed] [her] general ability to lead . . . her normal life." Mich. Comp. Laws § 500.3135(7). In support of their motion, Defendants contend that Plaintiff has failed as a matter of law to establish either prong of this standard. The Court cannot agree.

In arguing that Plaintiff has failed to establish an "objectively manifested impairment," Defendants observe as an initial matter that "[s]ubjective complaints that are not medically documented are insufficient." Kreiner, 683 N.W.2d at 625. Rather, the Michigan Court of Appeals recently explained that "a plaintiff's injury must be capable of objective verification by a qualified medical person either because the injury is visually apparent or because it is capable of detection through the use of medical testing." Netter

17

v. Bowman, 272 Mich. App. 289, 725 N.W.2d 353, 362 (2006) (footnote omitted).  In Defendants' view, the record here features only Plaintiff's "self-reported complaints of pain and suffering" and "self-imposed limitations," with the objective testing of Plaintiff's physicians revealing "only degenerative changes."  (Defendants' Motion, Br. in Support at 11-12.)

This reading of the record, however, ignores the findings of Plaintiff's physicians based on their examination and testing — findings which, at a minimum, raise material "factual dispute[s] concerning the nature and extent of [Plaintiff's] injuries," Mich. Comp. Laws § 500.3135(2)(a)(ii), and therefore preclude a determination as a matter of law in Defendants' favor.  In particular, Dr. Backos concluded in an October 4, 2005 addendum to his narrative report that Plaintiff suffered from a centrally herniated disc in the C4-C5 region with effacement of the subarachnoid space and the disc abutting up against the thecal sac, and he opined that this injury was "significant" and "would be expected to produce pain and spasm" consistent with Plaintiff's complaints.  (Plaintiff's Response, Ex. 4, 10/4/2005 Report.)  In addition, Dr. Glanz states in her affidavit that Plaintiff suffered a "tear or strain of the anterior talofibular ligament of the left foot," and that, as a result of the auto accident, Plaintiff now suffers from "chronic ankle joint pain that will persist indefinitely."  (Plaintiff's Response, Ex. 3, Glanz Aff. at ¶¶ 8, 12.)  Notably, the diagnoses of both Dr. Backos and Dr. Glanz were based, at least in part, upon their review of MRI scans.  This record provides the requisite "objective verification" by qualified medical personnel of injuries that are "capable of detection

through the use of medical testing." Netter, 725 N.W.2d at 362. It also defeats Defendants' contention that Plaintiff's limitations were wholly self-imposed, where her physicians identified specific conditions that were consistent with her complaints of pain and would limit her range of motion, ambulation, and capacity to work.

Moreover, it is clear, and Defendants do not seriously dispute, that the injuries identified by Plaintiff's physicians have impaired one or more of Plaintiff's "important body function[s]." Mich. Comp. Laws § 500.3135(7). As noted in McDanield, 707 N.W.2d at 219, cervical injuries of the sort identified by Dr. Backos here which caused significant neck pain and limited her range of motion would "come into play in almost any activity or movement." See also Netter, 725 N.W.2d at 363 ("There is no dispute that the movements of one's back and neck are important body functions."); Williams, 702 N.W.2d at 670 (holding that injuries that limited the plaintiff's range of motion in his wrist and shoulder qualified as impairments of important body functions); McMullen, 405 F. Supp.2d at 833 (noting the defendant's concession in that case that the plaintiff's herniated disc was an objectively manifested impairment of an important body function). Likewise, Dr. Glanz's report of a ligament tear or strain that caused severe ankle pain and limited Plaintiff's ability to walk establishes an impairment of an important body function. See Cassidy v. McGovern, 415 Mich. 483, 330 N.W.2d 22, 30 (1982) (observing that "[w]alking is an important body function"). Accordingly, Plaintiff has identified issues of material fact as to whether her injuries resulted in an "objectively manifested impairment of an important body function." Mich. Comp. Laws §

19

500.3135(7).

This leaves only the question whether Plaintiff's impairments "affect[ed] [her] general ability to lead . . . her normal life." Mich. Comp. Laws § 500.3135(7). As Defendants point out, Plaintiff's showing on this point is made considerably more difficult by her immediate return to work on the Monday following her Friday automobile accident, and her demonstrated ability to continue working for three month until she determined that she could no longer perform her job. Moreover, while the record contradicts Plaintiff's deposition testimony that she waited almost three months before seeking medical treatment, there is no evidence of any medical finding or opinion in the immediate aftermath of the accident that she was restricted from work or any other activity. Rather, it appears that the first such restrictions were imposed only upon Plaintiff's April 27, 2004 visit to Dr. Backos, over two months after the accident.

Nonetheless, upon analyzing the five factors enumerated in <u>Kreiner</u>, 683 N.W.2d at 626, the Court concludes that material issues of fact remain as to whether Plaintiff's impairments affected her general ability to lead her normal life. Turning first to the nature and extent of Plaintiff's impairments, while her injuries did not prevent her from returning to work for a three-month period after the accident, Plaintiff testified that she suffered back, neck, and leg pain during this time period, and that she was limited from all other activities. (<u>See</u> Plaintiff's Dep. at 32, 40.) In addition, once Plaintiff sought medical attention, her doctors determined that she was suffering from significant ankle and cervical injuries, prescribed pain and other medications and physical therapy, and

found her disabled from working and performing household chores.  These impairments are comparable in nature and extent to those that were found to qualify as serious impairments of body function in <u>McDanield</u>, 707 N.W.2d at 219, and <u>McMullen</u>, 405 F. Supp.2d at 838.

The next two <u>Kreiner</u> factors — the type and length of treatment and the duration of the impairment — also support the conclusion that Plaintiff's impairments have affected her general ability to lead her normal life.  Both Dr. Glanz and Dr. Backos recounted their lengthy and significant efforts to treat Plaintiff's injuries.  Dr. Glanz states in her affidavit that for a two-year period, she has "administered, oftentimes on a weekly basis, injection therapy, alternated with nerve blocks and physical therapy treatments in [Plaintiff's] ankle joint."  (Plaintiff's Response, Ex. 3, Glanz Aff. at ¶ 10.)  Similarly, Dr. Backos reports that over the 15-month period that he treated Plaintiff, he prescribed pain medication, a muscle relaxant, and physical therapy, as well as referring Plaintiff to a neurosurgeon for evaluation.  (<u>See</u> Plaintiff's Response, Ex. 4, Backos Aff. at ¶¶ 7, 9; 9/6/2005 Report at 3-4.)  In addition, both of these physicians determined in late January of 2005, nearly a year after Plaintiff's automobile accident, that she remained unable to return to work, and Dr. Backos recommended household assistance for several months after the accident.  Again, this record is comparable to the evidence presented in <u>McDanield</u>, 707 N.W.2d at 219, where the plaintiff was out of work for six or seven months and was significantly limited in her household chores and recreational activities.

The final two factors that <u>Kreiner</u> suggests are relevant are the extent of any

residual impairment and the prognosis for eventual recovery.  On one hand, Plaintiff has returned to work, and she testified that she has been able to resume many of her usual activities, albeit for shorter periods of time.  (See Plaintiff's Dep. at 42.)  On the other hand, both of Plaintiff's treating physicians have diagnosed her with continuing impairments.  Dr. Glanz states that while Plaintiff's two-year "treatment regimen has been successful in managing [Plaintiff's] severe pain and limited motion in her left ankle joint," she nonetheless continues to suffer from "chronic ankle joint pain that will persist indefinitely."  (Plaintiff's Response, Ex. 3, Glanz Aff. at ¶¶ 10, 12.)  Dr. Backos has diagnosed Plaintiff's condition as a centrally herniated disc in the C4-C5  region, and has stated that Plaintiff's "[p]rognosis for full recovery is poor in view of the significant period of time that has transpired without significant improvements."  (Plaintiff's Response, Ex. 4, 9/6/2005 Report at 4.)  The courts in the above-cited cases have pointed to similar evidence of permanent limitations and chronic pain in finding that impairments have affected the ability to lead a normal life.  See, e.g., McDanield, 707 N.W.2d at 219; Williams, 702 N.W.2d at 670; McMullen, 405 F. Supp.2d at 838; cf. Kreiner, 683 N.W.2d at 627 (citing plaintiff Straub's estimate that "he was ninety-nine percent back to normal" within four months after his motorcycle accident); Netter, 725 N.W.2d at 363 (finding that the plaintiff in that case had "failed to show that the course or trajectory of her normal life was affected as a result of [her] relatively brief period (six months) of recuperation").  On balance, then, the Court finds that this evidence of lingering effects lends further support to the conclusion that Plaintiff's injuries impaired her general ability

to lead her normal life.

In the end, Defendants' motion rests almost exclusively upon Plaintiff's return to work within three days after her automobile accident, as well as the limited medical treatment she sought in the immediate aftermath of this incident. The Michigan Court of Appeals, however, has cautioned against placing too much weight upon an individual's decision to return to work:

> We are troubled by the fact that some individuals injured in a motor vehicle accident, while incurring pain or disabilities that might reasonably preclude continued employment, nonetheless continue to work, enduring the pain and discomfort because of a strong work ethic and pride or because of absolute economic necessity, yet, by doing so, damage their ability to show a change in their life following the accident.

McDanield, 707 N.W.2d at 219 n.5.[4] In this case, Plaintiff's return to work is offset by the opinions of her treating physicians, based on objective medical evidence and repeated examinations over more than a year, that she suffered significant impairments that precluded her from working for several months, caused her substantial and ongoing pain, and limited her ability to perform household and other activities. Under these circumstances, the Court finds that issues of material fact remain as to whether Plaintiff has suffered a "serious impairment of body function" that would permit a noneconomic recovery under Michigan's no-fault statute.

---

[4]Similarly, this Court has previously noted that the Michigan no-fault statute arguably penalizes those who diligently "pursu[e] a rigorous and largely successful course of rehabilitation" and then promptly return to work, because such an individual will be unable to point to a permanent or long-lasting impact upon his or her ability to lead a normal life. McCloskey v. Klair, No. 05-70279, 2006 WL 3825270, at *10 n.3 (E.D. Mich. Dec. 27, 2006).

# IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for

summary judgment is DENIED.

                                        s/Gerald E. Rosen
                                        Gerald E. Rosen
                                        United States District Judge

Dated:  September 25, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 25, 2008, by electronic and/or ordinary mail.

                                        s/LaShawn R. Saulsberry
                                        Case Manager